FILED

2024 Sep-09  PM 03:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | |
|---|---|
| PHILLIP GRIMES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:23-cv-00550-NAD |
| | ) |
| SOCIAL SECURITY | ) |
| ADMINISTRATION, | ) |
| COMMISSIONER, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Phillip Grimes appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for disability benefits. Doc. 1. Plaintiff Grimes applied for disability benefits with an alleged onset date of July 27, 2021. Doc. 9-4 at 2, 9–10; Doc. 9-7 at 2. The Commissioner denied Grimes's claim for benefits. Doc. 9-3 at 2–6, 8–21. In this appeal, the parties consented to magistrate judge jurisdiction. Doc. 12; 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUE FOR REVIEW

In this appeal, Grimes argues that the Administrative Law Judge (ALJ) failed

1

to properly evaluate Grimes's subjective testimony under the so-called "pain standard," such that substantial evidence does not support the ALJ's determination that Grimes could perform a range of light work.  Doc. 15 at 5–11.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages:    (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the

administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

(1)   whether the claimant is engaged in substantial gainful activity;

(2)   if not, whether the claimant has a severe impairment or combination of impairments;

(3)   if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)   if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and,

(5)   if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts

to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

A.    With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d

4

at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion." *Cabrera v. Commissioner of Soc. Sec.*, No. 22-13053, 2023 WL 5768387, at *8 (11th Cir. Sept. 7, 2023).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. And the Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## BACKGROUND

### A. Grimes's personal and medical history

Grimes was born on July 20, 1972. Doc. 9-4 at 2. Grimes worked as a police officer from 1999 through August 2021. Doc. 9-8 at 2.

On October 26, 2020, Grimes saw Dr. Anthony Esposito at the Anniston Neurology and Headache Clinic with a chief complaint of multiple sclerosis. Doc. 9-9 at 22. Dr. Esposito noted that Grimes's "change in activity tolerance" had decreased, and that his motor function, self-care capacity, and sensory deficits had improved. Doc. 9-9 at 22. Grimes reported more fatigue and "difficulty performing his job duties." Doc. 9-9 at 22. Grimes also reported mild back pain. Doc. 9-9 at 22. He had no abnormal balance, no confusion, no numbness, no tingling, and no headache. Doc. 9-9 at 22. He was anxious and irritable but not depressed. Doc. 9-9 at 22. Grimes was directed to continue taking Mayzent medication for his multiple sclerosis. Doc. 9-9 at 23. Dr. Esposito noted that Grimes's multiple sclerosis was "well controlled." Doc. 9-9 at 23.

On December 14, 2020, Grimes saw Dr. William Perry for an annual checkup. Doc. 9-9 at 13. Grimes reported no localized joint pain, no dizziness, no fainting, no motor disturbances, no anxiety, and no depression, but did report sleep disturbances. Doc. 9-9 at 13. His physical examination was grossly normal. Doc. 9-9 at 14–15. Dr. Perry noted that Grimes had multiple sclerosis, sleep apnea, elevated blood pressure, and high cholesterol. Doc. 9-9 at 15. Dr. Perry counseled Grimes to lose weight. Doc. 9-9 at 15.

On April 29, 2021, Grimes had an appointment with Dr. Perry because he had a random glucose test that showed that his sugar was high, and because he needed

refills of medication. Doc. 9-9 at 11. His physical examination was grossly normal. Doc. 9-9 at 11–12. Dr. Perry ordered labs and advised a low carbohydrate diet. Doc. 9-9 at 12.

On May 4, 2021, Grimes had an abdominal ultrasound that showed abnormal liver function. Doc. 9-9 at 16.

On June 15, 2021, Grimes had a checkup with Dr. Perry. Doc. 9-9 at 9. Dr. Perry noted active problems including elevated blood pressure, gout, high cholesterol, multiple sclerosis, sleep apnea, and liver abnormality. Doc. 9-9 at 9.

On July 27, 2021, Grimes saw Dr. Esposito at the Anniston Neurology and Headache Clinic complaining of a syncopal episode and "severe fatigue." Doc. 9-9 at 25. Grimes reported that he had a 5 second syncopal episode following injection of a medication for his multiple sclerosis. Doc. 9-9 at 25. Prior to the episode, Grimes had chest pain, palpitations, dizziness, and shortness of breath. Doc. 9-9 at 25. Grimes reported that his cognitive function and self-care capacity were worsening, though his motor function remained stable. Doc. 9-9 at 25. Grimes reported fatigue and malaise, as well as blurring vision, joint pain, muscle pain, decreased range of motion, and memory loss. Doc. 9-9 at 25. Grimes did not have abnormal balance, confusion, numbness, tingling, dizziness, or headache, and was anxious and irritable but not depressed. Doc. 9-9 at 25. His physical examination was normal, including normal range of motion and strength, and he was able to

7

complete a serial sevens cognitive test, but slowly.  Doc. 9-9 at 26.

On September 2, 2021, Grimes completed an adult disability report, in which he reported that multiple sclerosis limited his ability to work, and that he had stopped working because of his multiple sclerosis.  Doc. 9-8 at 12–18.

On October 4, 2021, Grimes completed an adult function report.  Doc. 9-8 at 23–30.  Grimes stated that he lived in a house with his wife.  Doc. 9-8 at 23.  He stated that he had issues with his memory, was "tired most of the time," and that it was "hard to get out of bed for the day" because of fatigue caused by multiple sclerosis.  Doc. 9-8 at 23.  Grimes reported that, since his retirement, he tried to relax and rest for most of the day and would "go to town" if he needed to do so, but could not stay out long because he tires easily.  Doc. 9-8 at 24.  Grimes stated that he does not take care of any other person or any pets.  Doc. 9-8 at 24.

Grimes stated in his function report that sometimes he wakes up at night with pain in his legs.  Doc. 9-8 at 24.  Grimes reported that he had no problem with personal care and did not need reminders about personal care or medication.  Doc. 9-8 at 24–25.  Grimes stated that he "sometimes" cooked, but that "most of the time" his wife cooked, or they went out to eat.  Doc. 9-8 at 25.  Grimes stated that he cut the grass or worked outside of the house when needed, and helped with other household duties, but that he did not do yardwork often because it tired him out, that he paid someone to mow the grass, and that his wife did most of the indoor chores.

Doc. 9-8 at 25.  Grimes stated that sometimes it was hard to get up to help his wife with chores and she had to ask him multiple times, and stated that the heat bothered him so that he sometimes felt like he was going to pass out, got weakness in his legs, or got lightheaded.  Doc. 9-8 at 26.

Grimes also stated in his function report that he went outside a few times per day and was able to travel by walking, driving, or riding in a car.  Doc. 9-8 at 26.  He stated that he could go out alone and was able to shop for groceries and medication.  Doc. 9-8 at 26.  Grimes stated that he usually shopped a couple of days per week for 30 minutes to 1 hour.  Doc. 9-8 at 26.  Grimes stated that he could handle his finances.  Doc. 9-8 at 26.  Grimes stated that he was able to play guitar in the church band once per week and was able to socialize once or twice per week.  Doc. 9-8 at 26–27.  He stated that he had no problems getting along with people.  Doc. 9-8 at 27.

Grimes stated further in his function report that his condition affected his ability to squat, bend, walk, hear, remember, and concentrate.  Doc. 9-8 at 28.  He stated that the distance he was able to walk varied by the day, and that he could resume walking after a 5 to 10 minute rest.  Doc. 9-8 at 28.  Grimes stated that he could follow instructions well on most tasks and could get along with all sorts of people, and had never been terminated from a position for failing to get along with people.  Doc. 9-8 at 28.  Grimes stated that stress caused him anxiety and he did not

handle changes in routine very well.  Doc. 9-8 at 29.

On November 16, 2021, Licensed Clinical Psychologist Dorn Majure conducted a consultative examination of Grimes.  Doc. 9-9 at 30–33.  Majure diagnosed Grimes with a mild unspecified depressive disorder, and noted that Grimes suffered from multiple sclerosis, hypertension, sleep apnea, and gout.  Doc. 9-9 at 30.  Grimes told Majure that he left his job as a police officer due to balance issues and stress.  Doc. 9-9 at 31.

Grimes reported to Majure that he completed his activities of daily living without assistance and was able to help with shopping, cleaning, cooking, and minimal yard work; Grimes also reported that he enjoyed playing guitar and was able to manage his own finances.  Doc. 9-9 at 31.  Majure observed that Grimes presented appropriately, that his recent and remote memory appeared to be intact, that he was well oriented, that his speech was unremarkable, and that his affect was appropriate.  Doc. 9-9 at 31.  Majure also observed that Grimes had an ok-to-frustrated mood, had intermittent insomnia, and had stressors including "not being able to do as before," chronic knee pain, and financial stress.  Doc. 9-9 at 31–32.

Majure assessed Grimes's intellectual functioning as being in the average range.  Doc. 9-9 at 32.  Grimes completed a battery of short cognitive tests, and Majure found Grimes to be "mildly impaired in the ability to understand, to carry out and remember instructions, and to respond appropriately to supervision,

coworkers and work pressures in a work setting."  Doc. 9-9 at 32.

On November 20, 2021, Grimes saw Dr. Michael Tanael for a medical consultative examination.  Doc. 9-9 at 35.  Grimes's chief complaints at the time were multiple sclerosis, back pain, and left shoulder pain.  Doc. 9-9 at 35.  Dr. Tanael noted that Grimes had had multiple sclerosis for 21 years and reported chronic fatigue that was worse in the heat, as well as "some short term memory loss."  Doc. 9-9 at 35.

Dr. Tanael noted that Grimes had "no difficulty" sitting, standing, or walking, and was able to cook and prepare meals, handle his personal care, do housekeeping and laundry, shop and bank, and drive.  Doc. 9-9 at 35.  Grimes presented as well groomed, alert, and oriented with no acute distress, and was cooperative and appropriate.  Doc. 9-9 at 36.  Grimes had paraspinal tenderness in his low back but normal range of motion in his back and extremities and normal strength.  Doc. 9-9 at 36–39.  Grimes had no difficulty getting on and off the exam table, walking on heels, walking on toes, or squatting and rising, and had a normal gait.  Doc. 9-9 at 37.

Dr. Tanael gave a medical source statement opining that Grimes "is able to perform all physical activities of examination."  Doc. 9-9 at 39.

On December 20, 2021, Grimes saw Dr. Perry for a follow-up appointment.  Doc. 9-9 at 52.  Dr. Perry noted that Grimes's multiple sclerosis was "stable."  Doc.

9-9 at 52.  Dr. Perry counseled Grimes about his diet.  Doc. 9-9 at 53.

On February 14, 2022, Grimes saw Dr. Esposito at the Anniston Neurology and Headache Clinic with a chief complaint of multiple sclerosis and severe fatigue. Doc. 9-9 at 56.  Grimes reported that his cognitive functioning and self-care capacity were worsening, and that he was having chronic fatigue and memory problems.  Doc. 9-9 at 56.  Grimes reported fatigue, decreased activity, malaise, joint pain, muscle pain, decreased range of motion, back pain, memory loss, anxiety, and irritability. Doc. 9-9 at 56.  He did not report abnormal balance, confusion, numbness, tingling, dizziness, headache, or depression.  Doc. 9-9 at 56.  Dr. Esposito characterized Grimes's multiple sclerosis as "well controlled, except for severe chronic fatigue," and noted that Grimes had "decided to apply for disability due to severe fatigue, cognitive issues, and diffuse pain," and that Grimes felt "that he may endanger himself or public as a Police Officer."  Doc. 9-9 at 58.

On June 15, 2022, Grimes saw rheumatologist Dr. Vishala Chindalore at the Anniston Medical Clinic with joint pain and stiffness that he described as constant and aching.  Doc. 9-9 at 67.  Grimes reported joint pain and stiffness, as well as back pain, fatigue, and trouble sleeping.  Doc. 9-9 at 67.  His physical exam was normal with normal/good range of motion.  Doc. 9-9 at 69.  Dr. Chindalore educated Grimes on arthritis.  Doc. 9-9 at 70.  Grimes had a positive ANA test suggesting autoimmune issues.  Doc. 9-9 at 76.  X-rays of Grimes's hands, knees, and pelvis showed some

joint space narrowing and arthritic changes in the hands and knees, and some arthritis in the lumbar spine.  Doc. 9-9 at 91.

On June 23, 2022, Grimes saw Dr. Perry for a checkup.  Doc. 9-9 at 62.  Dr. Perry noted that Grimes had seen Dr. Chindalore for arthritis and noted high blood pressure.  Doc. 9-9 at 62.

On September 22, 2022, Grimes saw Dr. Esposito at the Anniston Neurology and Headache Clinic with chief complaints of multiple sclerosis and severe fatigue. Doc. 9-9 at 92.  Grimes reported that his cognitive function and self-care capacity were unchanged, and that his motor function was stable, but that he still was having severe chronic fatigue.  Doc. 9-9 at 92.  Grimes reported joint pain, muscle pain, decreased range of motion, moderate back pain, memory loss, occasional giving out in his left leg, anxiety, and irritability.  Doc. 9-9 at 92.  He did not report abnormal balance, confusion, numbness, tingling, dizziness, headache, or depression.  Doc. 9-9 at 92.  A physical examination was grossly normal with normal gait and balance. Doc. 9-9 at 93.  Dr. Esposito noted that Grimes's multiple sclerosis was "well controlled."  Doc. 9-9 at 93.

## B.     Social Security proceedings

### 1.     Initial application and denial of benefits

On September 2, 2021, Grimes filed an application for Disability Insurance Benefits (DIB), alleging disability based on multiple sclerosis with an alleged onset

date of July 27, 2021.  Doc. 9-4 at 2; Doc. 9-7 at 2.  On November 30, 2021, Grimes's application for benefits was denied at the initial level on the basis of a finding that Grimes could perform work at a medium level and was not disabled.  Doc. 9-4 at 2–9.

On December 8, 2021, Grimes sought reconsideration of the initial denial of his application for benefits.  Doc. 9-5 at 12.  On March 16, 2022, Grimes's application was denied at the reconsideration level.  Doc. 9-4 at 10–20.

On March 24, 2022, Grimes requested a hearing before an ALJ (Doc. 9-5 at 24–25), and a telephonic hearing was held on November 1, 2022 (Doc. 9-6 at 7; Doc. 9-3 at 37–39).

On November 17, 2022, the ALJ issued an unfavorable decision.  Doc. 9-3 at 8–21.

### 2. ALJ hearing

On November 1, 2022, the ALJ held a telephonic hearing on Grimes's application for disability benefits.  Doc. 9-3 at 37–39.

Grimes's counsel stated at the hearing that Grimes was unable to maintain the pace of an 8 hour workday due to symptoms associated with multiple sclerosis, osteoarthritis, sleep apnea, and gout.  Doc. 9-3 at 41.

Grimes testified that, at the time of the hearing, he was 50 years old.  Doc. 9-3 at 41.  He testified that he previously had worked as a police officer and had been

police chief for around 4 years.  Doc. 9-3 at 41–42.  He testified that, while he was chief, he still did patrols.  Doc. 9-3 at 42.  Grimes testified that he medically retired because the "stress of the job was just getting to [him] too bad," he was having "some medical issues . . . with [his] feet and [his] legs," and he was having "memory problems."  Doc. 9-3 at 42.  Grimes testified that he was on medication for multiple sclerosis for years, such that he did not have significant multiple sclerosis symptoms, but that "the stress of the job just was getting to [him]."  Doc. 9-3 at 43.

Grimes also testified that he had gout, and had pain in his knees and legs that made it hard for him to "stand for any length of time."  Doc. 9-3 at 43.  He testified that he was not sure if his pain was caused by multiple sclerosis, gout, arthritis, or a combination, but testified that he could usually prevent a gout flare by taking his medication.  Doc. 9-3 at 43.  Grimes testified that he was "not really sure" if his gout flares were activity related.  Doc. 9-3 at 44.

Grimes testified further that he had undergone an MRI to check his multiple sclerosis about a month before the hearing, and his doctor said that everything "looked ok."  Doc. 9-3 at 44.  Grimes testified that he did not do much during the day and tended to "just sort of sit here" because "most of the time [he's] so tired [he] can't get up and, and go."  Doc. 9-3 at 45.  He attributed his tiredness to his multiple sclerosis.  Doc. 9-3 at 45.

Grimes testified that when he was a police officer he had to carry 25 to 30

pounds of gear.  Doc. 9-3 at 46.  He testified that he could dress himself and could shower and bathe by himself.  Doc. 9-3 at 46.  Grimes testified that he did not remember things well enough to be a police chief anymore, but was not sure if he had been tested for memory deficits.  Doc. 9-3 at 46.  He testified that he started having memory issues about a year or a year and a half before the hearing, that he would forget "simple . . . little things," and that he noticed the issues becoming progressively worse.  Doc. 9-3 at 46.  Grimes testified that he did not take any medication for depression at the time of the hearing.  Doc. 9-3 at 47.

Grimes also testified that he had dizzy spells "on a regular basis," amounting to "at least several times a day."  Doc. 9-3 at 47.  He stated that he had back pain and joint pain, and had previously had two back surgeries.  Doc. 9-3 at 47.  He testified that he had pain and numbness in his legs, and that sometimes his left leg would give way and "just go out from under [him]."  Doc. 9-3 at 48.  Grimes testified that, when he has a gout flare up, it is difficult to walk, such that he has to sit down after a short time and sometimes cannot wear a shoe.  Doc. 9-3 at 49.  Grimes testified that, due to fatigue, he spends "at least a couple hours" per day lying down and often naps because he is tired.  Doc. 9-3 at 49.  He testified that he is able to do some yardwork, but "not much," and that someone comes to his house to take care of "the grass and stuff" for him.  Doc. 9-3 at 49.  He testified that he watches television but sometimes has problems remembering or following what he is

16

watching.  Doc. 9-3 at 49–50.  Grimes testified that, while he was working as a police officer, he took limited time off for doctor's appointments, but did not take days off due to fatigue.  Doc. 9-3 at 55–56.

Vocational expert (VE) Chelsea Brown then testified that a hypothetical individual with Grimes's age, education, work experience, and RFC (residual functional capacity) would not be able to perform Grimes's past relevant work.  Doc. 9-3 at 50, 56.  VE Brown testified that such a hypothetical individual with the limitations posed by the ALJ could perform jobs classified as light work that exist in significant numbers in the national economy, including cashier II and sales attendant.  Doc. 9-3 at 57–58.  VE Brown testified that such a hypothetical individual with the limitations posed by the ALJ also could perform jobs classified as sedentary work that exist in significant numbers in the national economy, such as an order clerk or an information clerk.  Doc. 9-3 at 58.

### 3.    ALJ decision

On November 17, 2022, the ALJ entered an unfavorable decision.  Doc. 9-3 at 8–21.  In the decision, the ALJ found that Grimes met the requirements for insured status through December 31, 2026.  Doc. 9-3 at 11.  "After careful consideration of all the evidence," the ALJ concluded that Grimes "has not been under a disability within the meaning of the Social Security Act from July 27, 2021, through the date of this decision."  Doc. 9-3 at 12.

The ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. § 404.1520; *Winschel*, 631 F.3d at 1178).  Doc. 9-3 at 12–13.  The ALJ found that Grimes was insured through December 31, 2026, that he had not engaged in substantial gainful activity since his alleged onset date of July 27, 2021, and that Grimes had severe impairments of "multiple sclerosis, obesity, osteoarthritis of the hands and knees, and degenerative disc disease."  Doc. 9-3 at 13.  The ALJ found that Grimes had non-severe impairments of depression, gout, hypertension, and obstructive sleep apnea.  Doc. 9-3 at 13–15.  The ALJ found that Grimes did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations.  Doc. 9-3 at 15.

The ALJ determined Grimes's RFC (or residual functional capacity), finding "after careful consideration of the entire record" that Grimes could "perform light work," except that he could frequently climb ramps and stairs, could stoop, kneel, crouch, and crawl, could never climb ladders, ropes, or scaffolds, could occasionally balance, could have only occasional exposure to extremes of cold, heat, and vibration, and could have no exposure to hazards such as unprotected heights and hazardous machinery.  Doc. 9-3 at 16.  The ALJ stated that the ALJ had considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  Doc. 9-3 at

16.  The ALJ also stated that the ALJ had considered any medical opinions and prior administrative medical findings.  Doc. 9-3 at 16.

In assessing Grimes's RFC and the extent to which his symptoms limited his function, the ALJ stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities."  Doc. 9-3 at 16.  The ALJ also stated that, where the claimant's statements about the intensity, persistence, or limiting effects of symptoms were not substantiated by objective medical evidence, the ALJ "must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities."  Doc. 9-3 at 16.

In determining Grimes's RFC, the ALJ stated that Grimes alleged an inability to work due to multiple sclerosis.  Doc. 9-3 at 16.  The ALJ stated that Grimes testified at the hearing that he experienced severe fatigue due to his multiple sclerosis and had to retire as police chief due to his inability to do the job because of his multiple sclerosis symptoms.  Doc. 9-3 at 16.  The ALJ stated that Grimes also alleged that chronic pain in his hands, knees, and back kept him from being able to work.  Doc. 9-3 at 16.

The ALJ then found that Grimes's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Grimes's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  Doc. 9-3 at 16.

The ALJ stated that, in determining Grimes's RFC, the ALJ "must consider the nature, location, onset, duration, frequency, radiation, and intensity of his symptoms; any precipitating and aggravating factors . . . and any functional restrictions imposed by his impairments, either alone or in combination."  Doc. 9-3 at 16.  The ALJ also stated that the ALJ had to consider Grimes's non-severe impairments of gout, depression, and hypertension in determining Grimes's RFC. Doc. 9-3 at 16.

The ALJ found that there was no evidence that Grimes's non-severe impairments imposed any functional limitations on Grimes's ability to work.  Doc. 9-3 at 17.  The ALJ found that Grimes was obese, but that no physician had attributed any limitations to Grimes based on his obesity.  Doc. 9-3 at 17.  The ALJ acknowledged, however, that obesity could exacerbate subjective complaints of pain, and took that into account in determining Grimes's RFC.  Doc. 9-3 at 17.

The ALJ also found that, regarding Grimes's degenerative disc disease, Grimes complained of low back pain at the hearing and—though he had not had

much treatment for low back pain—x-rays showed some arthritic changes to the lower lumbar spine. Doc. 9-3 at 17. The ALJ found that, in November 2021, Dr. Tanael noted that Grimes had no trouble squatting and rising, had normal gait, and had full lumbar range of motion. Doc. 9-3 at 17. Nevertheless, because Grimes had "some documented low back pain," and because "imaging revealed mild arthritic changes," the ALJ found that Grimes was limited to light exertional work. Doc. 9-3 at 17.

Regarding Grimes's arthritis of the hands and knees, the ALJ found that treatment records showed that Grimes had complained of pain since at least 2021, and that Grimes told his doctor that he applied for disability in July 2021 due to his multiple sclerosis issues including "diffuse pain, chronic fatigue, and some cognitive issues." Doc. 9-3 at 17. The ALJ found that Grimes had a normal examination with Dr. Tanael in November 2021, during which he had normal gait, full range of motion in all areas, 5/5 strength, the ability to walk on his heels, walk on his toes, and squat without difficulty, and the ability to pinch and manipulate bilaterally. Doc. 9-3 at 17. The ALJ found that Grimes had a positive ANA test in 2022 and was assessed for joint pain in June 2022, but still had full range of motion. Doc. 9-3 at 17. The ALJ found that x-rays of Grimes's hands and knees did reveal some mild joint space narrowing. Doc. 9-3 at 17. The ALJ found that, because of Grimes's "hand and knee pain, a limitation to less than the full range of light exertional work is

21

appropriate."  Doc. 9-3 at 17.

Regarding Grimes's multiple sclerosis, the ALJ found that Grimes was diagnosed in 2000, and that his condition was "typically described as well controlled," though Grimes "had complaints of chronic fatigue since the alleged onset date."  Doc. 9-3 at 17.

The ALJ found that Grimes testified that he stopped working due to cognitive decline and fatigue caused by his multiple sclerosis, but that "[d]espite these complaints" Grimes "had no difficulty performing serial 7's in his psychological evaluation in November 2021 and was found to have only mild limitations in his ability to understand, remember, and carry out instructions."  Doc. 9-3 at 17.

The ALJ also found that Grimes's "treating records for his multiple sclerosis show he continually reported no difficulties with confusion and no abnormal balance," and that Grimes's "most recent visit in September 2022 showed he reported his left lower extremity gave out occasionally but continued to report no balance problems."  Doc. 9-3 at 17.

The ALJ found further that, while Grimes "clearly has some limitations from his multiple sclerosis, his records show his symptoms would warrant a limitation to less that the full range of light work with occasional balancing and frequent climbing of ramps and stairs, stooping, kneeling, crouching, and crawling."  Doc. 9-3 at 17–18.

The ALJ considered Grimes's medications and found that Grimes had not reported any side effects.  Doc. 9-3 at 18.

The ALJ then considered Grimes's daily activities and found that Grimes was "independent in his personal care and hygiene, can drive a car and go grocery shopping, cooks sometimes and helps with household chores if needed."  Doc. 9-3 at 18.  The ALJ found that Grimes had described activities "consistent with a reduced range of light exertional work."  Doc. 9-3 at 18.

The ALJ then considered the medical opinions and prior administrative medical findings.  Doc. 9-3 at 18–19.  The ALJ found that the initial agency assessment that Grimes could perform a range of medium work was not persuasive, as that finding did not account for restrictions stemming from Grimes's multiple sclerosis.  Doc. 9-3 at 18–19.

The ALJ found that the opinion of Dr. Tanael was persuasive, as it was based on an in-person examination by a physician familiar with the agency rules and was "consistent with the medical evidence in the file which suggests that the claimant's multiple sclerosis is controlled."  Doc. 9-3 at 19.  The ALJ found that, "[a]ll in all, there is nothing in the record to suggest that this assessment is anything other than accurate."  Doc. 9-3 at 19.

The ALJ also found persuasive Majure's opinion that Grimes would be mildly impaired in his ability to understand, carry out, and remember instructions, as well

as in his ability to respond appropriately to supervision, coworkers, and work pressures. Doc. 9-3 at 19. The ALJ found that Majure's opinion was based on an in-person examination and was consistent with Grimes's activities of daily living. Doc. 9-3 at 19. The ALJ also found that the record showed "no current treatment for a mental health impairment." Doc. 9-3 at 19.

The ALJ found further that an RFC of light work with additional limitations was "supported by the claimant's activities of daily living, by the examination by Dr. Majure and the examination by Dr. Tanael, and by the claimant's treating records." Doc. 9-3 at 19. The ALJ found that "[n]othing in the record precludes the claimant from performing work at the light exertional level with the additional restrictions enumerated above." Doc. 9-3 at 19.

The ALJ found that Grimes was unable to perform any of his past relevant work as a police officer and police chief. Doc. 9-3 at 19.

At step five, after considering Grimes's age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant numbers in the national economy that Grimes could perform. Doc. 9-3 at 20. The ALJ considered the testimony of the VE and found that Grimes would be able to perform the requirements of representative occupations such as cashier II and sales attendant I. Doc. 9-3 at 20. Consequently, the ALJ found that Grimes was capable of making a successful adjustment to other work that exists in significant numbers in the national

economy, and as a result had not "been under a disability, as defined in the Social Security Act, from July 27, 2021, through the date of this decision."  Doc. 9-3 at 21.

### 4.    Appeals Council decision

On December 1, 2022, Grimes appealed the ALJ's decision to the Appeals Council.  Doc. 9-6 at 11–12; Doc. 9-3 at 5–6.  On March 16, 2023, the Appeals Council denied Grimes's request for review of the ALJ's November 17, 2022 decision, finding no reason to review the ALJ's decision.  Doc. 9-3 at 2–6.  Because the Appeals Council found no reason to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g).

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.  The ALJ properly assessed Grimes's subjective testimony regarding his impairments and associated symptoms, as the ALJ's decision properly was based on the multi-part "pain standard," and substantial evidence supports the ALJ's decision not to fully credit Grimes's subjective testimony regarding his symptoms.

## I.    The ALJ's decision properly was based on the multi-part "pain standard."

As an initial matter, the ALJ's decision properly was based on the multi-part "pain standard."  When a claimant attempts to establish disability through his own testimony concerning pain or other subjective symptoms, the multi-step "pain

25

standard" applies.  That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms.  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also Raper v. Commissioner of Soc. Sec.*, 89 F.4th 1261, 1277 (11th Cir. 2024); 20 C.F.R. § 404.1529 (standards for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [his] symptoms," and "evaluate [those] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled."  20 C.F.R. § 404.1529(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, the ALJ's decision articulated and tracked that controlling legal standard.  In analyzing Grimes's RFC, and the extent to which Grimes's symptoms limited his functioning, the ALJ stated that the ALJ "must follow" the required "two-step process":   (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent

to which they limit the claimant's work-related activities."   Doc. 9-3 at 16. According to the ALJ, where the claimant's statements about the intensity, persistence, or limiting effects of symptoms were not substantiated by objective medical evidence, the ALJ "must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities."  Doc. 9-3 at 16.

The ALJ then applied the two-part test and found first that Grimes's medically determinable impairments, including his multiple sclerosis, could reasonably be expected to cause the alleged symptoms.  Doc. 9-3 at 16.  The ALJ then proceeded to the next part of the "pain standard" analysis.  *See* Doc. 9-3 at 16.  The ALJ found second that Grimes's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  Doc. 9-3 at 16.  Thus, the ALJ's decision was based on the proper legal standards.

## II.   Substantial evidence supports the ALJ's decision to partially discredit Grimes's subjective testimony regarding his impairments and associated symptoms.

Furthermore, substantial evidence supports the ALJ's decision not to fully credit Grimes's subjective testimony regarding his impairments and associated pain and symptoms.

A.   **The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.**

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony. *Wilson*, 284 F.3d at 1225. A claimant can establish that he is disabled through his "own testimony of pain or other subjective symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements." 20 C.F.R. § 404.1529(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of his symptoms, the ALJ must consider all of the evidence, objective and subjective. 20 C.F.R. § 404.1529. Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, his precipitating and aggravating factors, his daily activities, the type, dosage, and effects of his medications, and treatments or measures that he has to relieve the symptoms. *See* 20 C.F.R. § 404.1529(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if

the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [his] symptoms." *See* 20 C.F.R. § 404.1529(c)(4). If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar). "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer*, 395 F.3d at 1210 (quotation marks and alterations omitted).[1] "The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ

---

[1] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Hargress*, 883 F.3d at 1308 (quoting Social Security Ruling 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)). But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record. *Id.* at 1308 n.3.

was clearly wrong to discredit it." *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

> **B.      The ALJ properly explained the decision not to fully credit Grimes's subjective testimony regarding his impairments, pain, and symptoms, and substantial evidence supports that decision.**

The ALJ properly explained the decision to partially discredit Grimes's subjective testimony regarding his pain and symptoms, and substantial evidence supports the ALJ's decision.

In his brief, Grimes argues that the ALJ's decision was not supported by substantial evidence because "the ALJ erroneously overlooked parts of the Plaintiff's medical record which are consistent with the Plaintiff's allegations and inconsistent with" the ALJ's findings, as the ALJ did not adequately consider parts of the record showing Grimes's fatigue and cognitive issues.  Doc. 15 at 8–12. Grimes also argues that the ALJ erred in finding that "Plaintiff's description of his daily activities is consistent with the ability to perform a reduced range of light exertional work." Doc. 15 at 10.  Grimes argues further that the "record in this case does not contain substantial evidence to support the ALJ's determination as it pertains to [the] conclusion that the Plaintiff can perform a range of light work." Doc. 15 at 7.

However, the ALJ's opinion shows that the ALJ considered the record as a whole, and substantial evidence supports both the ALJ's finding that Grimes's

testimony was not entirely consistent with the record evidence, and the RFC finding of light work with limitations. In arriving at those findings, the ALJ not only articulated and tracked the multi-part "pain standard" (*see* Part I *supra*), but also tracked the Eleventh Circuit law and applicable regulations for evaluating a claimant's subjective testimony (discussed above in Part II.A *supra*).

The ALJ made a clear and explicit finding that the ALJ did not fully credit Grimes's testimony about the intensity, persistence, and limiting effects of his symptoms. The ALJ provided detailed analysis of the record regarding Grimes's degenerative disc disease, arthritis, and multiple sclerosis, considering the medical opinions of Dr. Tanael and Majure, Grimes's treatment records, and Grimes's daily activities, finding that they were all consistent with an RFC of light work with additional restrictions. Doc. 9-3 at 17–19. The ALJ explicitly found that the RFC of light work with limitations was supported not just "by the claimant's activities of daily living," but also "by the examination by Dr. Majure and the examination by Dr. Tanael, and by the claimant's treating records." Doc. 9-3 at 19. The ALJ then explicitly stated that "[n]othing in the record precludes [Grimes] from performing work at the light exertional level with the additional restrictions enumerated above." Doc. 9-3 at 19. Accordingly, the ALJ provided an explicit articulation for discrediting Grimes's subjective testimony. *See Wilson*, 284 F.3d at 1225.

Moreover, in arriving at that articulation, the ALJ undertook a full

31

consideration of the record evidence.  In determining Grimes's RFC (and citing 20 C.F.R. §§ 404.1529 and 404.1520c, as well as Social Security Ruling 16-3p), the ALJ stated that the ALJ had considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and had considered any medical opinions and prior administrative medical findings.  Doc. 9-3 at 16.  In the decision, the ALJ included information based on both objective and subjective evidence that called into doubt Grimes's subjective testimony about the intensity, persistence, and limiting effects of his symptoms.  *See* 20 C.F.R. § 404.1529.

The ALJ's decision shows that, in determining Grimes's RFC and arriving at the finding that Grimes was not disabled, the ALJ considered Grimes's testimony— including testimony about his "severe fatigue because of his multiple sclerosis," his "inability to perform [his job as police chief] due to his symptoms from his multiple sclerosis," his chronic pain, and his daily activities—as well as his treatment records and the consultative examinations of Dr. Tanael and Majure.  Doc. 9-3 at 16–19. Indeed (as noted above), the ALJ explicitly referenced evidence that Grimes "has had complaints of chronic fatigue since the alleged onset date."  Doc. 9-3 at 17.

The ALJ also provided a thorough summary of the record, considering and comparing both the normal and abnormal medical indications therein.  The ALJ found that the record showed that Grimes had complained of low back pain and x-

rays showed some arthritic lumbar changes, but that Grimes had "not had much treatment" for back pain and had no issues squatting and rising or with gait and had normal lumbar range of motion during his examination with Dr. Tanael.  Doc. 9-3 at 17.  The ALJ also found that Grimes "had complaints of pain since 2021" and told his treating physician that he had applied for disability in July 2021 "due to issues from his multiple sclerosis, including diffuse pain, chronic fatigue, and some cognitive issues."  Doc. 9-3 at 17.

The ALJ found that Grimes had a positive ANA test in 2022 and had x-rays indicating joint narrowing, but had a comprehensively normal examination with Dr. Tanael and had normal range of motion.  Doc. 9-3 at 17.

The ALJ also found that Grimes's multiple sclerosis was "typically described as well controlled, though [Grimes] has had complaints of chronic fatigue since the alleged onset date."  Doc. 9-3 at 17.

The ALJ found further that, "despite" Grimes's complaints of "cognitive decline and fatigue issues stemming from his multiple sclerosis," Grimes was able to complete cognitive tests in November 2021, Majure found him to have only mild limitations, and his treatment records showed that he continually reported no problems with confusion and no abnormal balance.  Doc. 9-3 at 17.

Based on Grimes's testimony, the ALJ found that Grimes was independent with personal care and hygiene, could drive and go grocery shopping, and would

sometimes cook and help with chores "if needed." Doc. 9-3 at 18.

The ALJ also considered Dr. Tanael's assessment that Grimes could perform all physical activities on the examination and Majure's assessment that Grimes only had mild limitations—combined with a lack of current mental health treatment. Doc. 9-3 at 19.

Accordingly, the ALJ's decision considered information based on both objective and subjective evidence and explicitly accounted for evidence supporting Grimes's testimony, but also clearly identified evidence calling into doubt Grimes's subjective testimony about the intensity, persistence, and limiting effects of his symptoms. *See* 20 C.F.R. § 404.1529.

Further, the ALJ did not entirely discredit Grimes's testimony, but instead found it partially credible. In determining Grimes's RFC, the ALJ found that a state agency determination that Grimes could perform medium work was not persuasive and that Grimes would require additional restrictions, because Grimes's "diagnosed multiple sclerosis, while noted to be controlled, would necessarily involve some restrictions." Doc. 9-3 at 18. As a result, based on the record and Grimes's partially credible testimony, the ALJ "reduced the overall exertional level to light to provide every reasonable accommodation to the claimant while still being consistent with the medical evidence." Doc. 9-3 at 18–19. This finding shows that the ALJ did credit some of Grimes's testimony about his limitations. The finding also shows

34

that the ALJ factored into Grimes's RFC determination parts of Grimes's testimony, finding that Grimes's credible complaints of back pain, hand and knee pain, and multiple sclerosis symptoms warranted a limitation to light exertional work with additional restrictions. Doc. 9-3 at 17–18. Thus, the ALJ's RFC determination did not entirely discredit Grimes's subjective testimony, but rather accounted for the credible aspects of Grimes's testimony regarding his impairments and symptoms.

In short, the ALJ's decision and RFC finding accounted for Grimes's credible subjective testimony regarding his impairments, related pain, and other symptoms, and included the necessary "explicit and adequate reasons" for partially discrediting Grimes's subjective testimony about his symptoms. *Wilson*, 284 F.3d at 1225. The ALJ "considered [Grimes's] medical condition as a whole," and the decision was not just a "broad rejection" of Grimes's subjective testimony. *Dyer*, 395 F.3d at 1210.

In addition, substantial evidence supports the ALJ's decision not to credit all of Grimes's testimony about his symptoms, because the record supports the finding that there were some genuine inconsistencies or weaknesses regarding Grimes's subjective testimony, such that the ALJ was not "clearly wrong" to partially discredit the testimony. *See Werner*, 421 F. App'x at 939.

Grimes's treatment records provide support for the ALJ's findings. The record shows that, while Grimes did report worsening fatigue and memory problems

35

(Doc. 9-9 at 25, 56, 92), his physicians still often characterized his multiple sclerosis as "well controlled" and "stable" (Doc. 9-9 at 23, 52, 58, 93).   While Grimes told Majure that he left his police officer job due in part to balance issues (Doc. 9-9 at 31), Grimes never reported abnormal balance or confusion at his regular doctor's appointments and typically reported no dizziness or motor disturbances.   Doc. 9-9 at 13, 22, 25, 56, 92.   Throughout the record, Grimes had grossly normal physical examinations.   Doc. 9-9 at 11–12, 14–15, 26, 69, 93.   While Grimes reported worsening cognitive function, he still was able to complete cognitive tests like serial sevens.   Doc. 9-9 at 26, 32.   Even when Grimes self-reported a reduced range of motion, on examination his range of motion and strength were normal.   Doc. 9-9 at 26, 67, 92.   In his examination with Dr. Tanael, Grimes had no difficulty completing physical tasks.   Doc. 9-9 at 35–39.   Majure assessed Grimes as having only mild limitations, and Dr. Tanael effectively assessed Grimes as having no limitations at all.   Doc. 9-9 at 32, 39.

Grimes's own statements and hearing testimony provide support for the ALJ's RFC finding that Grimes was able to work at a light exertional level.   In his adult function report, Grimes stated that he had issues with his memory and was tired, but also stated that he could do things like driving, going to town, cooking, shopping, doing chores, and mowing the grass when he needed to do so.   Doc. 9-8 at 24–26. Grimes also stated in his adult function report that he had no issues with personal

care, did not need reminders to care for himself, could handle his finances, and was able to play guitar in the church band regularly.  Doc. 9-8 at 24–27.

Likewise, Grimes told Majure that he was able to complete his activities of daily living without assistance, could help with shopping, cooking, cleaning, and yardwork, and could play guitar and handle his finances.  Doc. 9-9 at 31.  At the hearing before the ALJ, Grimes testified that he left his job as a police officer largely because of the stress—along with problems with his feet and knees and memory issues—not because of fatigue, and testified that his medication had managed his multiple sclerosis symptoms.  Doc. 9-3 at 42–43.

While Grimes focused on his gout at the ALJ hearing, his medical records do not reflect strong concerns about gout.  *See* Doc. 9-3 at 43–44, 49; Doc. 9-9.  Grimes also stated that a recent MRI had indicated that everything "looked ok" with his multiple sclerosis.  Doc. 9-3 at 44.  Grimes testified that he could not remember things or be active enough to be a police chief anymore, but also testified that he did not think he had been tested for memory deficits and that he did not take days off as a police officer based on fatigue.  Doc. 9-3 at 46, 55–56.

Accordingly, the record includes sufficient facts inconsistent with the alleged severity of Grimes's limitations to support the ALJ's RFC determination and finding that Grimes was not disabled.  As discussed above, Grimes argues that the ALJ erred by "overlook[ing] parts of the Plaintiff's medical record which are consistent with

the Plaintiff's allegations" and by failing to consider the limitations on Grimes's daily activities.   Doc. 15 at 8–12.   But those arguments cannot overcome the evidence supporting the ALJ's decision and the indications that the ALJ considered the record as a whole.

The Eleventh Circuit has made clear that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in [the ALJ's] decision." *Noble v. Commissioner of Soc. Sec.*, 963 F.3d 1317, 1329 (11th Cir. 2020) (quoting *Dyer*, 395 F.3d at 1211).

Moreover, "[u]nder a substantial evidence standard of review, [a plaintiff] must do more than point to evidence in the record that supports her position; she must show the absence of substantial evidence supporting the ALJ's conclusion." *Sims v. Commissioner of Soc. Sec.*, 706 F. App'x 595, 604 (11th Cir. 2017) (citing *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991)).   Grimes has pointed to evidence supporting his position, but has not shown the absence of substantial evidence supporting the ALJ's decision.   For instance (and as discussed above), Grimes argues that the ALJ did not adequately consider parts of the record with respect to Grimes's severe fatigue.   *See* Doc. 15 at 8–12.

Although the record shows that Grimes did suffer from chronic fatigue (*see, e.g.*, Doc. 9-9 at 58, 92), the ALJ took Grimes's fatigue into account (Doc. 9-3 at 16–17), and substantial evidence supports the finding that Grimes still could perform

light work with extra limitations.

As explained above, substantial evidence requires "such relevant evidence as a reasonable person would accept as adequate to support a conclusion" (*Crawford*, 363 F.3d at 1158); and the court must affirm an ALJ's factual findings if they are supported by substantial evidence, "[e]ven if the evidence preponderates against the Commissioner's findings" (*Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529)).  This court cannot reweigh the evidence (*see Winschel*, 631 F.3d at 1178); and there is sufficient evidence in the record based on which a reasonable person would accept the ALJ's findings that Grimes's testimony regarding his symptoms was not consistent with the record as a whole, and that Grimes was not disabled (*see Crawford*, 363 F.3d at 1158).  Accordingly, substantial evidence supports the ALJ's decision.  In this regard, the ALJ clearly articulated a credibility finding that was supported by substantial evidence, and as a result the court cannot disturb that finding either.  *See Foote*, 67 F.3d at 1562.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the Commissioner's decision is **AFFIRMED**.  The court separately will enter final

judgment.

      **DONE** and **ORDERED** this September 9, 2024.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE